765 F.2d 175
 246 U.S.App.D.C. 306, 54 USLW 2004,
102 Lab.Cas. P 11,462
 INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW)
and its Local 547, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Milwaukee Spring Division of Illinois Coil Spring Company, Intervenor.
 No. 84-1106.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 27, 1985.
Decided June 18, 1985.
 
 Petition for Review of an Order of the National Labor relations board.
 Michael B. Nicholson, Detroit, Mich., with whom Jordan Rossen and Laurence Gold, Washington, D.C., were on the brief, for petitioners.
 Lawrence E. Blatnik, Atty., N.L.R.B., Washington, D.C., with whom John D. Burgoyne, Asst. Gen. Counsel, Wilford W. Johansen, Acting Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., were on the brief, for respondent.
 Gerard C. Smetana, Chicago, Ill., with whom Joseph J. Hahn, Chicago, Ill., was on the brief, for intervenor Milwaukee Spring Div. of Illinois Coil Spring Co. Gary L. Starkman, Chicago, Ill., entered an appearance for intervenor.
 Peter G. Nash, Dixie L. Atwater and Stephen A. Bokat, Washington, D.C., were on the brief for amicus curiae, Chamber of Commerce of the United States, urging affirmance.
 Before ROBINSON, Chief Judge, and EDWARDS and SCALIA, Circuit Judges.
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 This case presents the narrow question whether, during the term of a collective bargaining agreement, section 8(d) of the National Labor Relations Act[1] ("NLRA" or "Act") prohibits an employer from advising union bargaining agents that part of the company's operations might be relocated unless the union agrees to midterm contract concessions, and from then deciding to relocate when those concessions are not received. The stipulated facts indicate that the employer acted without antiunion animus; that the relocation was prompted by purely economic considerations; and that the employer satisfied all contractual and legal obligations to bargain over the proposed relocation. The employer further asserts, without challenge from the union, that the relocation was fully consistent with the terms of the parties' collective bargaining agreement. We hold that, under these circumstances, section 8(d) proscribes neither the announcement of a tentative intention to relocate nor the final decision to relocate, and we therefore affirm the decision of the National Labor Relations Board ("NLRB" or the "Board").
 
 I. BACKGROUND
 A. Factual Background
 
 2
 The basic facts of this case were stipulated by the parties.[2] Illinois Coil Spring Company, a manufacturer of automobile parts, was, at the dates germane to this case, composed of three divisions--Holly Spring,[3] McHenry Spring and Milwaukee Spring. The three divisions and Illinois Coil Spring Company together constituted a "single employer" within the meaning of the NLRA, and the employees of each division constituted separate bargaining units. The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW" or "Union") represented the Milwaukee Spring employees at the time of the alleged unfair labor practices. The relevant collective bargaining agreement between Milwaukee Spring (the "Company") and the UAW, effective from April 1, 1980, to March 31, 1983, contained specific wage and benefits provisions, a union recognition clause, a management rights clause, an arbitration clause and an "entire agreement" or "zipper" clause.[4] The contract did not, however, include a work preservation clause--that is, a provision requiring bargaining unit work to remain at the Milwaukee facility for the duration of the agreement. The McHenry Spring employees were not represented by a union.
 
 
 3
 On January 26, 1982,[5] Milwaukee Spring first approached the Union seeking midterm contract concessions. On that date, the Company asked the UAW to forgo a wage increase scheduled for April 1, and to consent to other modifications. On March 12, Milwaukee Spring informed the Union that the Company's financial position had deteriorated since January, principally due to the loss of a major contract. In order to obtain relief from the comparatively higher labor costs under the union contract at Milwaukee Spring, the Company subsequently proposed relocating its Milwaukee assembly operations to the nonunion McHenry plant. The Company characterized this relocation decision as tentative, and indicated a willingness to consider any proposals or suggestions offered by the Union.
 
 
 4
 The parties engaged in substantial bargaining over the proposed relocation, but were unable to agree on the core issue of wages. Essentially, the employees voted to reject the terms under which the Company would agree to retain assembly operations at the Milwaukee facility, which included the cancellation of the scheduled wage increase, a reduction in the base wage rate for all employees, and the elimination of an incentive program for assembly operators. The employees also rejected any further consideration of contract concessions. The Company then announced its decision to transfer the assembly operations to the McHenry facility.
 
 B. Procedural History
 
 5
 On April 8, the UAW filed an unfair labor practice charge with the NLRB. The NLRB General Counsel issued a complaint against Milwaukee Spring, alleging that it had committed unfair labor practices in violation of sections 7, 8(a)(1), (3), and (5), and 8(d) of the NLRA.[6] The parties and the General Counsel thereafter requested that the proceeding be transferred to the Board and filed a Stipulation of Facts, which constituted the entire record in this case. The issue presented to the Board was identified as follows:
 
 
 6
 [W]hether an employer, after engaging in decision bargaining and while offering to engage in further effects bargaining, may, without union consent, relocate bargaining unit work during the term of an existing collective bargaining agreement from its unionized facility to its nonunionized facility, and lay off employees, solely because of comparatively higher labor costs in the collective bargaining agreement at the unionized facility which the Union declined to modify.[7]
 
 
 7
 The parties stipulated that the "relocation decision is economically motivated and is not the result of union animus" and that the "failure to provide an adequate return on investment prompted the decision to relocate ..., not an inability to pay the contractual wage rates."[8] They also stipulated that Milwaukee Spring had bargained to impasse with the UAW over the move.[9]
 
 
 8
 In its initial Decision and Order in Milwaukee Spring I,[10] the Board held that the Company's unilateral decision to transfer its assembly operations and the layoff of unit employees during the term of the collective bargaining agreement constituted a midterm contract modification within the meaning of section 8(d) and, thus, violated sections 8(a)(1), (3), and (5) of the Act. The Board did not, however, identify which provisions of the contract were modified by Milwaukee Spring's actions. As relief, the Board ordered the Company to cease the transfer and attendant layoffs, restore any work that had been moved, reinstate any employees who had been laid off due to the relocation, and compensate any such employees for losses suffered as a consequence.
 
 
 9
 The Company sought review of the Board's decision in the United States Court of Appeals for the Seventh Circuit and the Board cross-petitioned for enforcement of its order. While the case was pending in the Seventh Circuit, the NLRB filed a motion to remand the case to the Board for further consideration, which the court granted.
 
 
 10
 On remand, in Milwaukee Spring II,[11] the Board reversed its earlier decision and dismissed the complaint. The Board first noted that section 8(d) requires an employer to obtain the consent of a union bargaining agent before implementing changes that will modify the terms and conditions contained in an existing collective bargaining agreement.[12] Consequently, the Board reasoned, before it could find a violation of section 8(d) in this case, it must identify a specific term "contained in" the contract that was modified by the Company's decision to relocate.[13] Observing that the Board in Milwaukee Spring I had not specified which contract provision it believed was modified by the relocation decision, the Board proceeded to conduct its own review of the collective bargaining agreement. It found no explicit work preservation clause and held that neither the wage and benefit provisions nor the union recognition clause gave rise to an implied agreement to preserve bargaining unit work at the Milwaukee plant for the duration of the contract.[14] The Board expressly found that no other term in the contract restricted the Company's decisionmaking regarding relocation.[15] Therefore, the NLRB concluded that Milwaukee Spring's decision to relocate did not modify the contract in contravention of sections 8(d) and 8(a)(5).[16] The Board also held that, because the parties stipulated that the Company had bargained to impasse over the relocation, the Company had not violated section 8(a)(5) of the Act. Since the Board found no section 8(a)(5) violation in this regard, it also determined that there was no basis for finding that any resultant layoff of employees violated section 8(a)(3).
 
 
 11
 The UAW appealed, on the theory that the Company's actions violated section 8(d).
 
 II. DISCUSSION
 
 12
 A. General Principles Regarding the Duty to Bargain During the Term of an Agreement
 
 
 13
 The duty of management and labor to negotiate in good faith over mandatory subjects of bargaining, imposed by section 8(a)(5) and defined in section 8(d) of the Act, persists even after a collective bargaining agreement is reached.[17] During the term of a contract, however, the scope of the duty to bargain over a particular mandatory subject depends upon whether that subject is "contained in" the contract.
 
 
 14
 Where a mandatory subject is not contained in the contract, an employer must bargain in good faith to impasse with union representatives; if no agreement is reached, the employer may unilaterally implement its bargaining proposal with respect to the matter not contained in the agreement.[18] Where a mandatory subject is contained in the contract, however, section 8(d) further limits an employer's actions.[19] That section provides that "no party to [the] contract shall terminate or modify [it], unless the party desiring [the] termination or modification ... (4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract ... until its expiration date." The statute also states that neither party shall be "requir[ed] ... to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective under the provisions of the contract." Thus, it is well understood that section 8(d) prohibits an employer from altering contractual terms concerning mandatory subjects of bargaining during the life of a collective bargaining agreement without the consent of the union.[20]
 
 
 15
 A mandatory subject of bargaining may be brought into the "contained in" category, and therefore within the provisions of section 8(d), either through explicit reference, such as a wage provision, or through a general waiver of the duty to bargain, such as a zipper clause.[21] Generally speaking, a zipper clause has the effect of incorporating all possible topics of bargaining--both those actually discussed and those neither discussed nor contemplated during bargaining--into the contract. As a result, with the inclusion of a zipper clause, section 8(d)'s "contained in" requirements are brought into play with regard to all mandatory subjects of bargaining; neither party may require the other to bargain over any mandatory subject, nor unilaterally implement a change in the status quo concerning a mandatory subject, even after bargaining to impasse.[22]B. Application of the "Contained In" Requirements of Section 8(d)
 
 
 16
 Before we apply the forgoing legal principles to the instant case, it will be useful to recapitulate the facts salient to our analysis. The contract at issue here contained both a zipper clause and a management rights clause. The Company asserts that the management rights clause granted it the right to make a unilateral decision concerning relocation for the purpose of increasing profits. The Union does not contest this contractual right, nor does it argue that the contract was violated or modified in any other way by the relocation decision. The Board expressly found that "no ... term contained in the contract restricts [the Company's] decisionmaking regarding relocation." The parties stipulated that Milwaukee Spring's relocation decision involved no antiunion animus and was motivated solely by the desire to obtain an adequate return on investment. They further stipulated that the Company had bargained to impasse over the relocation issue and stood willing to bargain over the effects of the move.
 
 
 17
 Proper analysis of both subjects of bargaining at issue in this case--i.e., the matters of wage concessions and relocation--demonstrates that both are "contained in" the contract and that the company did not violate section 8(d) with respect to either subject.
 
 
 18
 The wage concession issue is straightforward and simple. Wages are indisputably a mandatory subject of bargaining and, as it was explicitly addressed by the collective bargaining agreement between Milwaukee Spring and the UAW, section 8(d) limitations on midterm modifications apply. The record offers no evidence that the UAW was in any way "required" to bargain over the proposed wage concessions. Instead, there is every indication that the Union participated in the negotiations voluntarily, and chose, as was its right under section 8(d), to reject the Company's proposal. Furthermore, as the Board found, the Company implemented no change in the wage structure. Thus, section 8(d) was not violated by Milwaukee Spring's actions concerning the requested modification of wages.
 
 
 19
 The Board's and the parties' treatment of the relocation decision obscures somewhat the threshold issue whether it was "contained in" the contract. Nevertheless, we think it is clear from the Company's assertions, the Union's concessions, and the Board's treatment of the relocation decision, that the Board proceeded on the theory that the subject of relocation was "contained in" the collective bargaining agreement. Specifically, the Board seems to have determined that the Company's right to make relocation decisions stemmed either from the management rights clause or from implied management reserved rights. In either case, it is undisputed that the Company acted consistently with the contract in deciding to relocate, and thus did not modify the agreement in violation of section 8(d).[23]
 
 
 20
 First, the Company insists that it "bargained for and secured a management rights clause[24] that permit[ted it] to determine what work would be conducted at its Milwaukee Spring plant" and that this clause "constituted unequivocal waiver by the Union of any bargaining right it otherwise might have had regarding the relocation decision."[25] On appeal, the Union does not challenge this interpretation of the agreement.
 
 
 21
 Second, the Union does not contest the Company's right to make the relocation decision under the contract. Nor does it argue here that Milwaukee Spring in any way modified or violated the contract. In effect, the UAW concedes the Company's contractual right to make that decision. This tacit concession is not surprising in light of the breadth of the management rights clause.[26] If the UAW had believed that the management rights clause did not grant Milwaukee Spring the right to make relocation decisions, the Union would have argued to the Board that the zipper clause[27] prohibited the Company from unilaterally implementing the relocation decision, even after bargaining to impasse.
 
 
 22
 Finally, the Board expressly found that "no ... term in the contract restrict[ed Milwaukee Spring's] decisionmaking regarding relocation."[28] This means that, given the presence of the zipper clause in the parties' contract, the Board implicitly decided either that the management rights clause gave the Company the right to make relocation decisions or that, based on a reserved management rights theory,[29] such a right is inferable from the contract. Essentially, then, the Board determined that, in deciding to relocate, Milwaukee Spring acted consistently with the contract, and thus did not violate section 8(d).
 
 
 23
 It could be argued that the Board treated the relocation decision as a subject that was not "contained in" the contract, and thus decided that, since the parties stipulated that they bargained in good faith to impasse, the Company did not violate section 8(d) by then deciding to relocate. Given the zipper clause, we do not believe this characterization of the Board's analysis to be viable. If relocation is a mandatory subject and it was found either not to be contained in the management rights clause or not to be an implied management reserved right, the zipper clause would have prevented the Company from unilaterally deciding to relocate the assembly operation during the term of the contract, even after bargaining to impasse. Although a zipper clause may waive the obligation to bargain over all mandatory subjects during the term of an agreement, it surely does not waive the union's right to object to an employer's taking unilateral action with respect to such subjects. Thus, if an employer is not acting on a claim of right under the contract, or pursuant to a reserved management right inferable from the contract, it may not institute changes with respect to mandatory subjects without the consent of the union. Since the Union did not pursue this line of analysis, and did not rely on the zipper clause to oppose the relocation decision, it is clear that the UAW assumed that the Company acted pursuant to a right under the agreement.[30]
 
 
 24
 We think the Board correctly held there to be no section 8(d) violation here. Milwaukee Spring apparently possessed the contractual right to make the relocation decision. As the Union seems to concede on appeal, no provision of the collective bargaining agreement was modified by that decision. In addition, no antiunion animus tainted the Company's decision. Under these circumstances, we can discover nothing in section 8(d) that proscribes Milwaukee Spring's actions. Furthermore, we find no merit to the Union's argument that the announcement of the tentative intention to relocate violated section 8(d). The value of the Company's contractual right to relocate would be undermined--not to mention the strain it would place on logic--if we were to hold that although Milwaukee Spring had the right to decide unilaterally to relocate, the Act prohibited it from declaring in advance the intention to do so.[31]
 
 
 25
 C. The Union Claims Regarding "Economic Pressure"
 
 
 26
 The Union urges upon this court the theory that, while neither the Company's request for midterm contract concessions nor its decision to relocate may offend section 8(d) when taken in isolation, the combination of the two somehow violates that section of the Act. According to the UAW, section 8(d)'s provisions that neither party to a collective bargaining agreement is "requir[ed] ... to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract," and that an employer may not force its employees to accede to midterm modifications by locking them out, should be construed together to proscribe the use of any economic pressure to obtain contract concessions during the life of an agreement. Specifically, the Union argues here that section 8(d) prohibits an employer from coupling a request for midterm contract concessions with a statement of intention to exercise a right under the contract--in this instance, a right to relocate for economic reasons--if the Union does not find the proposed modification acceptable.
 
 
 27
 The Union's theory is untenable. First, we cannot see how two rights can make a wrong. Second, we can find no support for the UAW's proposition that section 8(d) condemns any midterm behavior by one party to a contract that results in the other party feeling "economic pressure" to bargain over modifications. The plain language of the statute proscribes only lockouts and strikes. Nothing in the rest of section 8(d), nor the Act's legislative history, persuades us that the Union's expansive reading of section 8(d)(4) is correct. Furthermore, the Union has been unable to cite any precedents[32] to support its thesis that "an employer or a union that uses economic pressure in the mid-term of a contract to force bargaining over or agreement on such a modification commits an unfair labor practice."[33]
 
 
 28
 In the absence of antiunion animus, it is lawful--and indeed common in this era of concession bargaining--for one party to a collective bargaining agreement to propose, midterm, the trade of a right it has under the contract for a modification of the agreement. The Union was under no compulsion to discuss wage concessions; it did so because it made sense in the context of the parties' bargaining relationship. This sort of ongoing flexibility in labor-management relations is crucial.[34] The freedom to suggest exchanges of rights permits parties to adapt their relationship to unanticipated events or changed circumstances during the lifetime of a contract, thus keeping the collective bargaining process vital and responsive to both sides' needs.
 
 III. CONCLUSION
 
 29
 Given that Milwaukee Spring acted without antiunion animus for purely economic reasons and fulfilled any statutory obligation to bargain that it might have had, we hold that the Company did not violate section 8(d) of the Act, either by offering to exchange its right to relocate for a midterm modification of the contract or by deciding to relocate when the Union rejected its modification proposals. The decision of the NLRB is
 
 
 30
 Affirmed.
 
 
 
 [1]
 29 U.S.C. Sec. 158(d) (1982)
 
 
 [2]
 Stipulation to Transfer Proceedings to the Board, reprinted in Joint Appendix ("J.A.") 3-8
 
 
 [3]
 In June 1982, the Holly Spring Plant was closed and its operations were transferred to the McHenry facility. No unfair labor practice charges were filed in connection with this closure
 
 
 [4]
 Agreement Between Milwaukee Spring Division of Illinois Coil Spring Company and UAW, Record Document E
 
 
 [5]
 All dates hereinafter refer to 1982 unless otherwise indicated
 
 
 [6]
 29 U.S.C. Secs. 157, 158(a)(1), (3), and (5), 158(d) (1982)
 
 
 [7]
 J.A. 7-8
 
 
 [8]
 J.A. 7
 
 
 [9]
 Id
 
 
 [10]
 265 N.L.R.B. 206 (1982)
 
 
 [11]
 268 N.L.R.B. 601 (1984)
 
 
 [12]
 Id., at 602 (citing Oak Cliff-Golman Baking Co., 207 N.L.R.B. 1063 (1973), enforced, 505 F.2d 1302 (5th Cir.1974), cert. denied, 423 U.S. 826, 96 S.Ct. 42, 46 L.Ed.2d 43 (1975))
 
 
 [13]
 Id
 
 
 [14]
 Id
 
 
 [15]
 Id
 
 
 [16]
 In order to make NLRB precedents consistent with this holding, the Board overruled Boeing Co., 230 N.L.R.B. 696 (1977), enforcement denied, 581 F.2d 793 (9th Cir.1978), and University of Chicago, 210 N.L.R.B. 190 (1974), enforcement denied, 514 F.2d 942 (7th Cir.1975), and overruled the portion of Los Angeles Marine Hardware, 235 N.L.R.B. 720 (1978), enforced, 602 F.2d 1302 (9th Cir.1979), that held that the respondent's transfer of work from one location to another violated sections 8(a)(5) and 8(d) of the Act. Milwaukee Spring II, 268 N.L.R.B. at 604
 
 
 [17]
 See, e.g., NLRB v. Acme Industrial Co., 385 U.S. 432, 436, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967); R. GORMAN, BASIC TEXT ON LABOR LAW 455 (1976)
 
 
 [18]
 See discussion of case law in R. GORMAN, supra note 17, at 464
 
 
 [19]
 Section 8(d), codified at 29 U.S.C. Sec. 158(d), reads in relevant part:
 For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: Provided, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification--
 (1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;
 (2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;
 (3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and
 (4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:
 The duties imposed upon employers, employees, and labor organizations by paragraphs (2) to (4) of this subsection shall become inapplicable upon an intervening certification of the Board, under which the labor organization or individual, which is a party to the contract, has been superseded as or ceased to be the representative of the employees subject to the provisions of section 159(a) of this title, and the duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract.
 
 
 [20]
 See, e.g., Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 159, 183-88, 92 S.Ct. 383, 387, 399-402, 30 L.Ed.2d 341 (1971); NLRB v. Scam Instrument Corp., 394 F.2d 884, 886-87 (7th Cir.), cert. denied, 393 U.S. 980, 89 S.Ct. 449, 21 L.Ed.2d 441 (1968); Oak Cliff-Golman Baking Co., 207 N.L.R.B. 1063, 1064 (1973), enforced, 505 F.2d 1302 (5th Cir.1974), cert. denied, 432 U.S. 826, 96 S.Ct. 42, 46 L.Ed.2d 43 (1975), C & S Indus., Inc., 158 N.L.R.B. 454, 457 (1966); R. GORMAN, supra n. 17, at 463-64
 
 
 [21]
 A zipper clause "purports to close out bargaining during the contract term and to make the written contract the exclusive statement of the parties' rights and obligations." R. GORMAN, supra note 17, at 471
 
 
 [22]
 Cf. Jacobs Mfg. Co., 94 N.L.R.B. 1214, 1217 (1951) (suggesting that during the term of a contract, section 8(d) permits a party to a contract to refuse to discuss a bargainable subject that is "contained in" the contract), enforced, 196 F.2d 680 (2d Cir.1952); R. GORMAN, supra note 17, at 461, 469-72
 
 
 [23]
 The Board never reached the issue whether relocation is a mandatory subject of bargaining. Neither must we decide that issue. Even assuming arguendo, as we do here, that it is a mandatory subject, we can find no violation of the duty to bargain or of section 8(d). See generally First National Maintenance Corp. v. NLRB, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981) (employer has no duty to bargain concerning its decision to shutdown part of its business for purely economic reasons where there is no allegation of antiunion animus); Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964) (employer has duty to bargain over the replacement of employees in an existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment); Otis Elevator Co., 269 N.L.R.B. No. 162, 115 L.R.R.M. 1281 (April 6, 1984) (plurality opinion) (employer has no duty to bargain concerning its decision to transfer its research and development operations where that decision is principally motivated by a desire to enhance product's competitiveness, undate technology and eliminate duplication in operations), corrected, 269 N.L.R.B. No. 162, 116 L.R.R.M. 1075 (1984)
 
 
 [24]
 The management rights clause reads as follows:
 Except as expressly limited by the other Articles of this Agreement, the Company shall have the exclusive right to manage the plant and business and direct the working forces.
 These rights include, but are not limited to, the right to plan, direct and control operations, to determine the operations or services to be performed in or at the plant or by the employees of the Company, to establish and maintain production and quality standards, to schedule the working hours, to hire, promote, demote, and transfer, to suspend, discipline or discharge for just cause or to relieve employees because of lack of work or for other legitimate reasons, to introduce new and improved methods, materials or facilities, or to change existing methods, materials or facilities.
 Record Document E, at 3.
 
 
 [25]
 Brief of Intervenor, Milwaukee Spring, at 12-13
 
 
 [26]
 It is also noteworthy that, although arbitration seemingly was available under the parties' agreement to resolve any dispute over the company's proposed relocation, the union apparently elected not to pursue a contract grievance. It is not clear why this case was not submitted to arbitration pursuant to Collyer Insulated Wire. 192 N.L.R.B. 837 (1971)
 
 
 [27]
 The zipper clause contained in the contract was a typical one, in which each party
 waives the right, and each agrees that the other shall not be obligated, to bargain collectively with respect to any subject or matter referred to or covered in this Agreement, or with respect to any subject or matter not specifically referred to or covered in this Agreement, even though such subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement.
 Record Document E at 26.
 
 
 [28]
 Milwaukee Spring, 268 N.L.R.B. at 602
 
 
 [29]
 This is the "commonly endorsed theory of labor relations [holding] that management retains all rights preexisting the contract that the union does not expressly extract from management in a specific clause." R. GORMAN, supra note 17, at 471. We express no view on the legitimacy of this theory
 
 
 [30]
 Unfortunately, the Board blurred its analysis by holding that, because the parties stipulated that the Company bargained to impasse, Milwaukee Spring did not violate section 8(a)(5). Milwaukee Spring II, 268 N.L.R.B. at 603-04. Obviously, if the Company had the contractual right to make the relocation decision, it had no duty to bargain before making that decision
 
 
 [31]
 Cf. NLRB v. Servette, Inc., 377 U.S. 46, 57, 84 S.Ct. 1098, 1105, 12 L.Ed.2d 121 (1964) (holding under section 8(b)(4) of the Act, 29 U.S.C. Sec. 158(b)(4), that statutory protection for the distribution of handbills would be undermined if a threat to engage in protected conduct were not itself protected)
 
 
 [32]
 The two cases cited by the Union, United Electrical, Radio & Machine Workers v. NLRB, 223 F.2d 338, 342 (D.C.Cir.1955), cert. denied, 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 850 (1956); Boeing Airplane Co. v. NLRB, 174 F.2d 988, 991 (D.C.Cir.1949), both concern strikes by employees, not generic "economic pressure."
 
 
 [33]
 Brief for UAW and its Local 547 at 19
 
 
 [34]
 As the Supreme Court has noted in the context of the role of arbitration in labor relations, a collective bargaining agreement is merely
 a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.... As one observer has put it ..., "[t]here are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights and duties."
 United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578-79, 80 S.Ct. 1347, 1350-51, 4 L.Ed.2d 1409 (1960) (citations and footnote omitted) (quoting Cox, Reflections Upon Labor Arbitration, 72 HARV.L.REV. 1482, 1498-99 (1959)).