842 F.2d 332
 131 L.R.R.M. (BNA) 3072
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
MARTIN MARIETTA ENERGY SYSTEMS, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 87-5369.
 United States Court of Appeals, Sixth Circuit.
 March 17, 1988.
 
 On Appeal from the National Labor Relations Board.
 Before LIVELY, Chief Judge, NATHANIEL R. JONES and MILBURN, Circuit Judges.
 PER CURIAM.
 
 
 1
 Petitioner seeks review of an order of the National Labor Relations Board holding that it had committed an unfair labor practice by engaging in a midterm modification of a collective bargaining agreement in violation of Section 8(a)(5) and (1) and Section 8(d) of the National Labor Relations Act. We shall enforce the order.
 
 I.
 
 2
 Petitioner, Martin Marietta Energy Systems, Inc. ("the Company"), operates certain government-owned laboratories and nuclear facilities at Oak Ridge, Tennessee pursuant to a contract with the United States Department of Energy. One of the facilities operated by the Company is the Oak Ridge Gaseous Diffusion Plant (referred to as K-25). The Oil Chemical and Atomic Workers International Union, and its Local 3-288 ("the Union"), have together represented hourly employees at K-25 since 1946. At all times relevant to this case, a collective bargaining agreement was in effect between the Company and the Union. This agreement was to expire on October 14, 1987.
 
 
 3
 Two memoranda of agreement, which are a part of the collective bargaining agreement, specify that the Company agrees to provide for its employees a Special Medical Expense Plan and a Hospital and Surgical Plan. Employee participation in both plans is voluntary. The specific matters covered in each of these plans are set forth in two booklets and both plans are incorporated into the contract as the Medical Insurance Plan for Hourly Employees, effective January 1, 1985. J.App. at 75A.
 
 
 4
 Article XV, Section 1 of the collective bargaining agreement contains a "zipper clause" which reads as follows:
 
 
 5
 It is hereby agreed that this contract contains the complete agreement between the parties or their successors, and no additions, waivers, deletions, changes or amendments shall be made during the life of this contract except by mutual consent, in writing, of the parties herein.
 
 
 6
 J.App. at 4A.
 
 
 7
 In late 1985, the Company began investigating Health Maintenance Organizations ("HMO's") with the thought that it might offer such plans as an alternative to the existing indemnity plans set out in the contract. To acquaint the various unions representing hourly employees at the Oak Ridge facility with the HMO concept, the Company scheduled meetings in December 1985 with the representatives of those unions, including Local 3-288. The Company met with representatives of Local 3-288 on December 19, 1985. The meeting was conducted by Robert Burnett, the Director of Personnel Administration.
 
 
 8
 As the Company acknowledges, Burnett's purpose at the meeting was two-fold. First, he reviewed with the Union the concept of HMO's and, second, he advised the Union of the Company's intent to implement an HMO during the first part of January 1986. During the meeting, Burnett gave a presentation using transparencies in which he described typical health care services which an HMO provides and contrasted the advantages and disadvantages of a typical HMO plan with those provided under the indemnity plan in effect at K-25. Because the Company had not yet contracted with any specific HMO, actual benefits by a specific HMO were not described.
 
 
 9
 Burnett emphasized at the meeting that the HMO would be offered as an alternative to the existing health care plan and not as a replacement. An employee who elected the HMO plan, however, could not remain enrolled in the indemnity benefit plan specified in the contract. When asked whether the benefits offered by HMO's were negotiable like those in the contractual indemnity plan, Burnett replied they were not, that the "HMO's themselves decide what they offer." J.App. at 144A. At the meeting, the Company did not solicit support or approval from the Union or ask whether it had any objections to the Company's plan. The Union, for its part, expressed neither support nor objection to the Company's announced plans.
 
 
 10
 More information regarding HMO's was disseminated to employees after the December 19 meeting. On January 6, 1986, the Company sent a letter to all employees stating that two HMO plans would be available to employees who lived within the geographical areas covered by the plans and that the enrollment period would be between January 15 and February 15. The letter also stated that individual employees could choose either to remain with the current plan or to join one of the HMO's. Thereafter, both HMO plans were implemented and coverage began March 1, 1986.
 
 
 11
 On January 21, 1986, the Union filed an unfair labor practice charge against the Company. A complaint was subsequently issued by the NLRB on May 13, 1986. The complaint alleged that the Company "unilaterally and without bargaining with the Union, implemented a health maintenance benefits plan for its employees," in violation of Sections 8(a)(5) and (1) of the Act.[1]
 
 
 12
 A hearing was held before an administrative law judge on June 24, 1986. Although the complaint, as noted above, alleges the unfair labor practice to be the Company's unilateral implementation of a health benefit plan, at the hearing the General Counsel asserted that the "broader issue" involved was whether there had been a midterm change in the collective bargaining agreement in violation of the proviso to Section 8(d) of the Act.[2]
 
 
 13
 After hearing all the evidence and considering the briefs filed by the parties, the ALJ concluded that by offering unit employees an HMO plan as an alternative to the existing indemnity plan, without obtaining the written consent of the Union, the Company unilaterally changed the collective bargaining agreement during its term, and "modified by abrogation that section of the contract requiring that any such modification be by mutual consent and in writing." J.App. at 11A. The ALJ concluded that the Company's action was in violation of the proviso to Section 8(d) and thus constituted a violation of Sections 8(a)(5) and (1) of the Act. In reaching this conclusion the ALJ rejected the Company's arguments that there was no midterm modification of the contract and that the Union had waived by inaction its rights to bargain on the issue of HMO's. The ALJ then recommended that the Company be ordered to take certain remedial action.
 
 
 14
 The Company filed exceptions to the ALJ's decision. On March 4, 1987, the Board adopted in full the ALJ's recommended order without opinion. The Company then filed this appeal and the Board cross-appealed for enforcement of its order.
 
 II.
 
 15
 It is well settled that an appellate court's review of a decision of the NLRB is exceedingly narrow. This court must accept the Board's factual findings as conclusive if supported by substantial evidence on the record as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-90 (1974). The Board's conclusions of law are entitled to acceptance if they are based upon a reasonably defensible construction of the Act. NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, 434 U.S. 335, 350 (1978); NLRB v. J. Weingarten, Inc., 420 U.S. 251, 266-67 (1975).
 
 
 16
 Section 8(a)(5) of the Act provides that it shall be an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees...." The limits of this statutory duty to bargain are defined in Section 8(d), which requires the employer to "confer in good faith with respect to wages, hours, and other terms and conditions of employment...." Because bargaining is mandatory only with regard to subjects which fall within this language, such subjects are called "mandatory" (as opposed to "permissive") subjects of bargaining. It is well established that the type of benefits involved in the instant case--i.e., health insurance benefits for active employees--represent mandatory subjects of bargaining under the Act. Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 159 (1971); Bastian-Blessing, Div. of Golconda Corp. v. NLRB, 474 F.2d 49, 52-53 (6th Cir.1973).
 
 
 17
 Section 8(d) of the Act is intended to stabilize the agreed upon conditions of employment during the term of the collective bargaining contract. Accordingly, that section not only imposes an obligation on each party to a contract to refrain from modifying the contract in the absence of compliance with the statutory notice and waiting period requirements, but also expressly provides that
 
 
 18
 [t]he duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract.
 
 
 19
 29 U.S.C. Sec. 158(d). In accord with the above-cited provision, it has consistently been held that an employer acts in derogation of its bargaining obligation under Section 8(d), and thereby violates Section 8(a)(5) and (1) of the Act when, during the effective period of the contract and without the consent of the union, it modifies contractually-determined benefits or other employment conditions which are mandatory bargaining subjects. Allied Chemical, 404 U.S. at 183-88 (citing NLRB v. The Scam Instrument Corp., 394 F.2d 884, 886-87 (7th Cir.1968)); International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. NLRB, 765 F.2d 175, 179-80 (D.C.Cir.1985); see generally R. Gorman, Basic Text on Labor Law, 463-64 (1976).
 
 
 20
 In the instant case, we believe the Board reasonably concluded that the Company's offer to employees, without the Union's consent, of an HMO plan as an alternative to the contractually-defined indemnity plan constituted a midterm modification of the collective bargaining agreement in violation of Section 8(d) of the Act. Regardless of whether unit employees ultimately considered the HMO option to be advantageous or not, the Company violated the Act by making the option available during the term of the contract without obtaining the Union's consent. The Act prohibits this type of unilateral action during a contract's term because such action threatens the stability of the bargaining relationship and tends to have a negative impact on employees' attitudes toward collective bargaining.
 
 
 21
 The Board also reasonably concluded that the Company's unilateral action modified by abrogation the clause in the contract requiring that there shall be no "additions, waivers, deletions, changes or amendments [to the contract] ... except by mutual consent in writing." Such a clause, called a "zipper clause," "purports to close out bargaining during the contract term and to make the written contract the exclusive statement of the parties' rights and obligations." R. Gorman, supra at 471. We agree with the Board that by offering the HMO option without the Union's consent the Company modified the zipper clause by abrogation.
 
 
 22
 The Company argues that the Union had a duty to bargain over the HMO plan once it was informed of the Company's intentions at the December 19th meeting. According to the Company, by sitting back and not acting the Union waived its bargaining rights and can not now complain that an unfair labor practice has occurred. This argument was properly rejected. As the Board pointed out, the Company cites only cases in which unions waived by inaction the right to bargain over unilateral changes in terms and conditions of employment not established by an outstanding collective bargaining agreement. See, e.g., Citizens National Bank of Willmar, 245 N.L.R.B. 389, (1979), enforced 644 F.2d 39 (D.C.Cir.1981). The issue here is not whether the Union had waived its right to bargain over issues timely proposed but, rather, whether it had abandoned a contractual right for which it had already bargained and had obtained in a collective bargaining agreement. Accordingly, since the cases cited by the Company deal with the former situation, not the latter, those cases are not applicable here. Moreover, as mentioned earlier, Section 8(d) expressly provides that the Union is entitled to remain silent in the face of a modification of a term or condition contained in the contract if, as here, the modification is to take place before it is authorized by the contract. Thus, we conclude that there is no merit to the Company's argument that the Union's inaction has somehow resulted in a waiver of its right to bargain over the proposed change.
 
 
 23
 We have considered the other arguments raised by the Company and find them to be without merit.
 
 
 24
 Therefore, for all of the foregoing reasons, we ENFORCE the order of the Board.
 
 
 
 [1]
 Sections 8(a)(1) and (5) of the Act provide as follows:
 (a) It shall be an unfair labor practice for an employer--
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7];
 * * *
 (5) to refuse to bargain collectively with the representatives of his employees....
 29 U.S.C. Sec. 158(a)(1) & (5) (1982).
 
 
 [2]
 Section 8(d), codified at 29 U.S.C. Sec. 158(d), provides in pertinent part as follows:
 (d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: Provided, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification--
 (1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;
 (2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;
 (3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and
 (4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later....