**CONOCO INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 95–1471.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 7, 1996.

Decided Aug. 20, 1996.

Terry S. Bickerton, San Antonio, TX, argued the cause and filed the briefs for petitioner.

John D. Burgoyne, Assistant General Counsel, National Labor Relations Board, Washington, DC, argued the cause for respondent, with whom Linda R. Sher, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, were on the brief.

Before: GINSBURG, SENTELLE and TATEL, Circuit Judges.

Opinion for the court filed Per Curiam.

PER CURIAM:

The National Labor Relations Board found that Conoco, Inc. impermissibly expanded the number of "progression units"—groups in which employees having similar jobs are ranked by seniority—without the consent of the Oil, Chemical, and Atomic Workers International Union. The Company contends, first, that the collective bargaining agreement (CBA) does not specify a fixed number of progression units; therefore, the Company may change the number subject only to a general obligation to bargain with the Union to impasse before effecting the change. (Conoco's compliance with this general obligation is not at issue here.) Second, Conoco insists that the broad discretionary powers conferred by the Management's Rights clause in the CBA allow the Company to change the number of progression units even if the CBA specifies a fixed number.

Because we conclude that the Management's Rights clause authorizes Conoco to change the number of progression units unilaterally in connection with a restructuring of the Company's operating divisions, we grant Conoco's petition for review and deny the Board's cross-application for enforcement.

## I. Background

Under § 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), it is an unfair labor practice for an employer to refuse to bargain with the representatives of its employees over the terms and conditions of employment. Once a term or condition of employment has been embodied in a contract for a fixed period, then under § 8(d) of the Act, 29 U.S.C. § 158(d), neither party can be required "to discuss or agree to any modification . . . if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract."

The Board, reading the two provisions together, correctly sets forth these two principles: "[1] [W]hen a collective-bargaining agreement is in effect and an employer seeks to modify the terms and conditions contained in the contract, the employer must obtain the union's consent before implementing the change. [2] If the employment conditions the employer seeks to change are not contained in the contract, however, the employer's obligation remains the general one of bargaining in good faith to impasse over the subject before instituting the proposed change." *Conoco, Inc.*, 318 N.L.R.B. No. 4, slip op. at 1 n. 5, 1995 WL 455369 (July 31, 1995).

Conoco contends that the second principle controls this case—that is, that the "as of" date in the contract did not bind the company to a specified number of progression units throughout the contract term and, therefore, the Company could make changes unilaterally after bargaining to impasse. Alternatively, Conoco argues that even if the first principle applies, the Union has already bargained over, and consented to, a change in the number of progression units under specified circumstances by agreeing to the terms of the Management's Rights clause of the CBA. *See NLRB v. United States Postal Serv.*, 8

F.3d 832, 836 (D.C.Cir.1993) (parties may negotiate contract terms that make it unnecessary to bargain over subsequent changes).

Conoco and the Union entered into consecutive CBAs beginning in 1971. The current CBA covering virtually all of the Company's 600 production and maintenance employees in Ponca City, Oklahoma, was effective on March 31, 1993. Article 20–1 covering progression units within the oil and chemical areas provides, in pertinent part, that "[a]s of April 1, 1993, the Operations Technology and Support Department shall be divided into the following progression units": technicians performing production work, technicians performing analytical services, and research craftsmen. In mid-June, Conoco decided to reorganize into separate oil and chemical divisions. Accordingly, it informed the Union that the three current progression units would become six—*i.e.*, each existing unit would be divided into a chemical unit and an oil unit. These changes were implemented on or before October 1, 1993 after the Company and the Union had negotiated but were unable to resolve their differences. According to Conoco, none of the 160 bargaining unit employees was affected by the changes.

In November 1993 the Union charged that Conoco had committed an unfair labor practice by unilaterally increasing the number of progression units from three to six. An Administrative Law Judge recommended that the complaint be dismissed but, in July 1995, the Board reversed the ALJ and held that Conoco had violated § 8(a)(5) within the meaning of § 8(d). The Board concluded that the number of progression units is a term specified in the CBA, in which case consent by the Union is required before the Company may expand the number.

## II. Analysis

As a threshold matter, Conoco argues that if a term in a contract is ambiguous, the Board should not intervene to select from among equally plausible interpretations unless such intervention is compelled by the Company's animus toward the Union, which was not alleged here. *See NCR Corp.*, 271 NLRB 1212, 1213, 1984 WL 36730 (1984). True enough, we have held that "under federal labor laws, arbitrators and the courts, rather than the Board, are the primary sources of contract interpretation." *Postal Serv.*, 8 F.3d at 837. On the other hand, the Board "has the authority to interpret collective bargaining agreements in order to resolve unfair labor practice cases," *id.*, and "a contractual defense does not divest the Labor Board of jurisdiction," *NLRB v. C&C Plywood Corp.*, 385 U.S. 421, 428, 87 S.Ct. 559, 564, 17 L.Ed.2d 486 (1967). Nonetheless, "[w]e accord no special deference ... to ultimate legal conclusions that rest on the Board's interpretation of a collective bargaining contract.... Thus we apply a *de novo* standard of review when interpreting the contract itself." *Local Union No. 47, Int'l B'hd of Elec. Workers v. NLRB*, 927 F.2d 635, 640–41 (D.C.Cir.1991) (*IBEW*).

We turn now to Conoco's two principal arguments: first, that the number of progression units is not covered by Article 20–1 of the CBA and, second, that the Management's Rights clause authorizes the Company to change the number of units without the consent of the Union after bargaining in good faith to impasse.

### A. Article 20–1

Since 1970, the Company has changed the number of progression units several times. Two of the changes were implemented mid-contract. In one instance, units were combined without Union consent, as specifically permitted by Article 26 of the CBA. In another instance, units were split, as here, but with the consent of the Union. Generally, progression units have been aligned with Company operating divisions; each time the divisions changed, the progression units were correspondingly realigned. Over the years, the progression units in existence at the beginning of each agreement have been identified in Article 20–1 "[a]s of" the date of the most recent realignment. For example, the biennial contracts from 1971 through 1977 referred to the units "[a]s of April 30, 1971"; that date changed in the 1979 contract to reflect an increase to five units "[a]s of March 1, 1979"; the new date lasted until a decrease to three units "[a]s of June 9, 1987," which first appeared in the 1989 contract.

■ Although the current CBA expressly identifies three progression units "[a]s of April 1, 1993," Conoco insists that the phrase was intended to provide that there would be three units on that particular date but not necessarily at any time thereafter. The ALJ agreed, concluding that "as of" meant "on" rather than "becomes effective on." He offered three reasons: First, the "as of" date and the effective date of the contract are virtually identical; accordingly, it would have been unnecessary to specify an "as of" date if the intent were to denote the term of the contract. Second, the units in place when the CBA went into effect were substantively identical to the units specified in the agreement; therefore, the agreement was not itself instituting a change in the status quo to become effective on a particular date. Third, on the cover page of the CBA and in the salary schedule—two places where the parties unambiguously intended to communicate "becomes effective"—the term "effective" is used rather than the phrase "as of."

Conoco adds that the parties' use of the same "as of" date through several contracts indicates that they did not intend for the date to correspond to the term of the contract. More likely, it meant "on [date] and until the next change in progression units." Moreover, Articles 8–4 and 8–5 of the CBA demonstrate that Conoco and the Union knew how to distinguish a point in time from an interval of time. In Article 8–4, the reference is to "[e]mployees in the progression units listed in Article 20–1 as of April 30, 1971." By contrast, Article 8–5 refers to "[e]mployees hired or transferred from outside OT&S into one of the progression units listed in Article 20–1 on or after April 30, 1971."

The Board, in concluding that "as of April 1, 1993" meant "effective as of April 1, 1993 and thereafter," advanced two arguments—neither of which we find convincing. First, because the original agreement on April 30, 1971 specified an "as of" date that coincided with the effective date of the contract, the parties must have intended "as of" to mean "effective as of." Second, in none of the ten CBAs subsequent to the original 1971 agreement.is the "as of" date the same as the

effective date of the contract, yet until now neither party has contended that this disparity evidences an intent to change the meaning from what it was in the 1971 agreement. The Board is on firmer ground, however, when it points out that "as of" could mean "on but not necessarily thereafter" only if "the parties [went] to the considerable trouble of negotiating and memorializing ... an essentially meaningless provision that had a shelf life of one day." *See Martinsville Nylon Employees Council v. NLRB*, 969 F.2d 1263, 1267 (D.C.Cir.1992) (parties "ought not be presumed to have included in their agreement a meaningless provision").

We are persuaded by the Company and the ALJ that "as of April 1, 1993" was not intended to mean "effective on April 1, 1993 and thereafter for the term of the agreement." On the other hand, Conoco has not shown that "as of" should be construed to mean "on and not necessarily thereafter." There is, in our view, a third alternative that meets Conoco's criticism without reducing "as of" to a one-day irrelevancy: namely, "as of April 1, 1993" means "effective on April 1, 1993 and until such time as permissibly changed in accordance with the collective bargaining agreement." This construction is consistent with the varying "as of" dates since 1971, and it imbues the provision with meaningful content; still, it need not extend the initial number of units to the entire period of the contract. Under this interpretation, the number of units at the commencement of the contract might well be revised prior to the expiration of the contract. Or the initial number could potentially extend throughout the entire contract period; indeed, absent an authorized change, that is precisely what would occur.

As we shall see in Part B below, the Management's Rights clause allows Conoco to change the number of progression units without the consent of the Union, but only when the change is associated with restructuring an operating division. Accordingly, the Union is protected by the "as of" provision, as we have construed it, against unilateral changes by the Company for any other reason or for no reason at all. At the same time, Conoco is permitted to change the

number of units unilaterally, provided that it does so in conformity with the CBA.

## B. *The Management's Rights Clause*

Article 11 of the CBA provides in pertinent part:

It is also solely the responsibility of Management to determine and to redetermine the organization of the ... Division including but not limited to its location, relocation, types of operation; and to determine the methods, processes and materials to be employed; to discontinue in whole or in part processes or operations or to discontinue their performance by employees of the ... Division or of the Company; to transfer either within or without the Company any work, technology, equipment or process.

The Board concluded that the Management's Rights clause does not permit a change in the number of progression units because it "does not specify that it applies to progression units, because there is a reasonable reading of the provision by which it does not apply to progression units, and because there [is no] evidence that in negotiating the 1993–'96 agreement the parties intended the provision to apply to progression units."

█ Conoco rejects this reasoning and reminds us of the ALJ's dual findings—to which the parties raised no objection—that (1) progression units are aligned with operating divisions, and (2) the Company can unilaterally rearrange the operating divisions. It follows, *according to Conoco*, that the right to change progression units is embraced within the right to change divisions.

In *Postal Service,* we relied upon a similar management rights clause to permit the employer unilaterally to change the work schedule and reduce the hours of certain employees. We acknowledged that the clause did not expressly relate to work hours; still, we stated:

[I]t is naive to assume that bargaining parties anticipate every hypothetical grievance and purport to address it in their contract. Rather, a collective bargaining agreement establishes principles to govern a myriad of fact patterns.

In the case before us, it is clear that service reductions are within the compass of Article 3 [the management rights clause]. That provision grants the Postal Service the "exclusive right" "To transfer and assign employees," and "To determine the methods, means and personnel by which [its] operations are to be conducted." Article 3 also gives the Postal Service the more general right "To maintain the efficiency of the operations entrusted to it." These rights surely permit an employer unilaterally to rearrange its employees' work schedules.

8 F.3d at 838. Conoco contends that the Management's Rights clause in its CBA is comparable in generality and scope to the clause in *Postal Service;* just as work hours are not mentioned but are nonetheless encompassed by the Postal Service clause, so also is the number of progression units implicitly covered by the Conoco clause.

The Board calls our attention to *International Union, United Auto., Aerospace and Agr. Implement Workers v. NLRB,* 765 F.2d 175 (1985) (*UAW*), where we suggested that a specific provision in a CBA will control over a generalized provision in a management rights clause. In that case, the employer advised the union that a part of the company's operations might be relocated unless the union agreed to wage concessions; when the union rejected the concessions, the company announced its decision to relocate. Even though the contract contained a broad management rights clause, *id.* at 182 n. 24, we concluded that "section 8(d) limitations on midterm modifications apply" and, therefore, the union need not consent to the wage reductions, *id.* at 181. Unlike *Postal Service* where the reduction in work hours did not violate the express terms of the CBA, the wage decreases in *UAW* would have contravened a specific provision of the contract. That difference, says the Board, accounts for the court's willingness to apply the generalized management rights clause in *Postal Service* but not in *UAW,* and because the CBA in *Conoco* explicitly prescribes the number of progression units, the holding of *UAW* governs—*i.e.,* the specific contract term over-

rides the more general management rights clause.

Our reading of *UAW* differs from the Board's. To be sure, we declined to apply the management rights clause in that case to allow the company unilaterally to reduce wages, but that is because the terms of the clause had nothing whatever to do with wages. The management rights clause in *UAW* gave the company the "exclusive right to manage the plant and business and direct the working forces." *Id.* at 182 n. 24. More specifically, the company had the right

to plan, direct and control operations, to determine the operations or services to be performed in or at the plant or by the employees of the Company, to establish and maintain production and quality standards, to schedule the working hours, to hire, promote, demote, and transfer, to suspend, discipline or discharge for just cause or to relieve employees because of lack of work or for other legitimate reasons, to introduce new and improved methods, materials or facilities, or to change existing methods, materials or facilities.

*Id.* Nothing in that clause remotely suggests the right to alter wage levels.

In stark contrast, we did invoke the management rights clause in *UAW* for the proposition that the company could unilaterally relocate its plant when the union rejected the proposed wage concessions; indeed, the union conceded the company's contractual right to make that decision. *Id.* at 181–82. The right to relocate is implicit throughout the clause, even if not enumerated in any of its express provisions. Moreover, we applied the management rights clause despite finding that the issue of relocation was "contained in" the contract, thereby triggering the requirements of § 8(d). *Id.* at 181. "[I]n light of the breadth of the management rights clause," *id.* at 182, its general provisions trumped. That relocation was deemed to be "contained in" the contract was no obstacle.

By this analysis, the key question in *Conoco* is whether the Management's Rights clause can reasonably be interpreted to permit the Company's decision to increase the number of progression units. We hold that it can—at least when such change is accom-panied by a realignment of operating divisions. Among the express authorizations in the clause, Conoco has the right to (a) determine the organization of the divisions, including types of operation; (b) discontinue processes or operations, or their performance by certain employees; and (c) transfer within or without the Company any work, technology, equipment, or process. It is difficult to imagine that these provisions would not encompass the right to increase the number of progression units—a number that traditionally has changed whenever the Company rearranges its divisions.

■ Where the employer acts, as here, pursuant to a contractual claim of right, the resolution of a refusal to bargain charge rests on an interpretation of the CBA. *Postal Serv.*, 8 F.3d at 837. A party "may exercise its right to bargain about a particular subject by negotiating for a provision in a [CBA] that fixes the parties' rights and forecloses further mandatory bargaining as to that subject." *IBEW*, 927 F.2d at 640. That is what occurred here; in negotiating the Management's Rights clause, the Union has already bargained over, and consented to, a change in the number of progression units associated with a restructuring of the Company's operating divisions.

### III. Conclusion

Notwithstanding that the "as of" date in Article 20–1 of the CBA is ambiguous, we hold that it may reasonably be interpreted to mean "effective on April 1, 1993 and until such time as permissibly changed in accordance with the collective bargaining agreement." We further hold that the Management's Rights clause authorized the Company unilaterally to increase the number of progression units in connection with its reorganization into separate chemical and oil divisions. Accordingly, we grant Conoco's petition for review and deny the Board's cross-application for enforcement.

*So ordered.*