NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

PACIFIC GRINDING WHEEL CO.,
INC., Respondent.

and

International Chemical Workers Union,
Local 614, AFL–CIO, Intervenor.

No. 76–1720.

United States Court of Appeals,
Ninth Circuit.

April 4, 1978.

Paul J. Spielberg (argued), Washington, D. C., for petitioner.

John E. Price (argued), of Price & Trujillo, Monte Vista, Co., for respondent.

Before WRIGHT, WALLACE and SNEED, Circuit Judges.

SNEED, Circuit Judge:

The National Labor Relations Board is seeking enforcement of its order issued against Pacific Grinding Wheel (the company). The only disputed issue is the Board's finding that the company violated §§ 8(a)(1) & (5) of the National Labor Relations Act (29 U.S.C. §§ 158(a)(1) & (5)) [1] by failing to bargain in good faith with Local 614 of the International Chemical Worker's Union (the union). The resolution of this issue requires us to ascertain whether the conclusions of an Administrative Law Judge were improperly rejected by the Board, the extent of the duty of the company to disclose to the opposing party factual information supporting its bargaining position, and the extent to which the substantive content of the company's bargaining proposals can be used to support a finding of refusal to bargain. We enforce the Board's order.

I. *Facts.*

This controversy began when Pacific Grinding Wheel attempted to reopen contract negotiations with the union in September 1973 even though the existing contract ran until May 1974. However, the company failed to notify either the federal or state mediation and conciliation service of its desire to terminate the contract as is required by § 8(d)(3) of the National Labor Relations Act.

Nevertheless, the company acted as if the contract was terminated, ignoring several of its provisions. During the fall of 1973 management personnel also communicated directly with employees, encouraging them to negotiate directly with company officials.

As a result of these actions, the union filed an unfair labor practice charge with the NLRB. However, before the hearing on the charge was completed a settlement agreement was worked out, in which the company promised to reimburse employees and the union for losses they had suffered as a result of the contract violations. In addition, the company agreed not to communicate directly with employees in regard to contract issues and agreed to bargain further with the union.

After the settlement was reached, negotiations resumed. The company made a new proposal on June 7, 1974, which included a wage increase coupled with changed workweek and overtime provisions. On June 10 the union membership voted to reject this proposal and to go out on strike.

The next proposal, which was made by the company on June 25, reflected a hardening of positions. The wage offer of June 7 was repeated, but several other provisions favorable to the union were dropped. Among the proposed changes was the abolition of the union security clause, which had been in all previous contracts. The compa-

---

1. These sections provide: "(a) It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in § 157 of this title; . . . (5) to refuse to bargain collectively with the representatives of his employees . . . ."

ny president explained this change by asserting that he had just learned that the union security clause was an optional contract term. Other changes proposed by the company further diminished union control over employees and their working conditions. Bargaining sessions, in early July failed to produce any agreement on these new proposals.

On July 15 the company made a new wage proposal. The starting wage was increased over the June 7 proposal, but the total number of wage categories was reduced, resulting in lower wages for many employees than under the earlier proposal. However, the company did volunteer to "red-circle" the current wages of any employee who would be scheduled to receive a reduced wage under the new proposal. Again, negotiations were unsuccessful.

The company's final proposal came on August 20. Wages were again less than offered under the previous proposal. In addition, the company withdrew its offer to red-circle the current wage rates of those employees who were earning more than the proposed rate.

The company justified these regressive wage proposals by pointing to the economic recession in the grinding wheel industry produced by the energy crisis. The company also claimed that its wages were already among the highest both in the local community and in the grinding wheel industry. An attorney for the union made a written request that data supporting these claims be made available to the union. However, the company never produced any written documentation, claiming that the request needed to be clarified. Nevertheless, neither side pursued the issue with vigor. The company failed to bring up the subject at the next bargaining session nor did the union repeat its request.

On September 13 the company asserted that an impasse existed and therefore proceeded to implement unilaterally the proposal it had made on August 20. During

August and September supervisory personnel again communicated directly with employees, promising them that they could have their jobs back at the same or even higher salaries if they would cross the picket line to return to work.

## II. NLRB Action.

A second unfair labor practice charge was filed by the union in the summer of 1974. The Administrative Law Judge ordered that the prior settlement agreement be set aside because the company had violated it and that both complaints be heard together.

The Administrative Law Judge then found that the company's failure to terminate properly the existing contract and the resulting violations of terms of that contract were contrary to §§ 8(a)(1) & (5). The discussions held by management personnel with employees were found to violate § 8(a)(1). Since Pacific Grinding Wheel did not make any exceptions to these conclusions, we must summarily grant enforcement of the order as it relates to these issues. 29 U.S.C. § 160(e); *NLRB v. Selvin*, 527 F.2d 1273, 1276 (9th Cir. 1975).[2]

However, the Administrative Law Judge rejected several charges made against the company. He found that the failure to provide economic information to the union was a mere technical violation of the duty to bargain and not an adamant refusal to reveal relevant data. The Administrative Law Judge also refused to find that, apart from the specific violations noted above, the company had bargained in bad faith. He finally held that the company's unilateral institution of its wage proposal was proper because impasse had been reached.

The General Counsel excepted to the Administrative Law Judge's failure to find that the company had refused to bargain in good faith and the case was referred to the Board. The Board found that the regressive wage offers and the withdrawal of the union security provision proposed by the

---

**2.** However, the conduct which led to these violations can be considered as background evidence in ascertaining the intent of the company when it performed the disputed actions. *See* *NLRB v. MacMillan Ring-Free Oil Co., Inc.*, 394 F.2d 26 (9th Cir.), *cert. denied*, 393 U.S. 914, 89 S.Ct. 237, 21 L.Ed.2d 199 (1968).

company after the union went out on strike indicated that it was attempting to humiliate the union and to avoid reaching an agreement. The Board also drew an adverse inference from the company's failure to produce documents to support its argument that economic considerations justified its proposals.

The Board accordingly found that the company had failed to bargain in good faith starting on June 25, 1974, the date of the first regressive proposal. Thus, the Board concluded that the strike had been converted into an unfair labor practice strike on that date. In addition, the Board found that the company's unilateral institution of its proposal in the absence of impasse was also a violation of the duty to bargain.

Initially, we will examine the principles by which we must be guided and then apply these principles to the facts of this case.

### III. *Board Finding of Failure to Bargain.*

We commence by reciting the usual litany. Our power to review the factual findings of the NLRB is limited, for such findings are conclusive if supported by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Thus, if there is evidence to support each of two conflicting views, the findings of the Board must be allowed to stand despite the fact that we might have reached the opposite conclusion on our own. *NLRB v. Walton Manufacturing Co.*, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962); *Universal Camera Corp. v. NLRB, supra.*

### A. *Effect of Overruling Administrative Law Judge.*

■ The company, to maximize the weight of the Administrative Law Judge's refusal to find a failure to bargain, argues that there is no evidence to support the Board's overruling of his recommendation. However, this is an incorrect formulation of the issue. The standard of review does not change simply because the Board has disagreed with the Administrative Law Judge. *Brooks v. NLRB*, 538 F.2d 260, 261 (9th Cir. 1976). We must still start with the finding

made by the Board and accept it if it is supported by substantial evidence. *NLRB v. Miller Redwood Co.*, 407 F.2d 1366, 1369 (9th Cir. 1969).

■ The Board is free to draw its own inferences from the evidence available to it. Thus, if the Board can point to evidence which supports its inference, courts have allowed the Board's finding to stand despite the fact that the Administrative Law Judge interpreted the facts contrary to the inference drawn. *NLRB v. Long Island Airport Limousine Service Corp.*, 468 F.2d 292 (2d Cir. 1972); *Oil, Chemical & Atomic Workers Local 4–243 v. NLRB*, 124 U.S.App.D.C. 113, 362 F.2d 943 (1966). Our recent decision in *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074 (9th Cir. 1977) illustrates that the Board has broad power to draw inferences from all the evidence presented.

■■ It is also well established that the Board need not treat self-serving declarations of an employer as conclusive, even if not contradicted by any direct testimony in the record. *Shattuck Denn Mining Corp. v. NLRB*, 362 F.2d 466, 470 (9th Cir. 1966). And it is disputed by none that, particularly when the Board is trying to establish motive and intent, all the circumstances of the case must be considered. *Bon Hennings Logging Company v. NLRB*, 308 F.2d 548, 554 (9th Cir. 1962); *cf. NLRB v. Walton Manufacturing Co., supra.*

■ In this case the critical issue is the good faith of the company's bargaining efforts. The Board was required to consider all the circumstances, not just the testimony credited by the Administrative Law Judge. The Board was free to draw its own inferences from all the evidence presented, giving whatever weight it felt appropriate to the company's self-serving explanations.

### B. *Duty to Disclose Data.*

The company also argues that the Board improperly drew an adverse inference from the company's failure to produce documentary evidence at the hearing to support its claim that economic necessity was the rea-

son for reducing its wage proposals. Assuming *arguendo* that such an adverse inference is improper,[3] it remains true that the company failed to disclose such information to the union during the course of negotiations after having made a claim of economic necessity.

■ The Supreme Court has recognized that a company's refusal to substantiate a claim of inability to pay can lead to a finding of failure to bargain in good faith. *NLRB v. Truitt Manufacturing Co.*, 351 U.S. 149, 153, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). Contrary to the Administrative Law Judge's opinion, this consequence is not limited to cases in which the company makes an actual plea of poverty, but can occur in other situations in which the company possesses data "relevant" to bargaining proposals it has submitted. *NLRB v. Western Wirebound Box Co.*, 356 F.2d 88, 91 (9th Cir. 1966) (company must substantiate claim of competitive disadvantage); *General Electric Co. v. NLRB*, 466 F.2d 1177, 1184 (6th Cir. 1972) (company must release correlated wage data to support its claim that wage proposal was "proper" in view of local wage standards).

■ In the instant case, since the union never followed up on its request for data, we agree that there is no independent violation of the company's duty to bargain resulting from its failure to produce this information. However, the company's initial refusal to release existing data concerning local and industry wage scales should be considered in evaluating the company's motives at the bargaining table.

C. *Substantive Content of Bargaining Proposals.*

■ The company also argues that the Board improperly based its finding of

failure to bargain on its distaste of the terms proposed by the company. The company correctly points out that the Supreme Court has stated that the NLRB does not have the power to compel either side to agree to any substantive contractual provisions. *H. K. Porter Co. v. NLRB*, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970). Board disapproval of proposed terms is not sufficient to support a finding of bad faith. *United Steelworkers of America v. NLRB*, 142 U.S.App.D.C. 315, 441 F.2d 1005, 1009 (1970), *cert. denied*, 409 U.S. 846, 93 S.Ct. 50, 34 L.Ed.2d 87 (1972). A company's adamant insistence on strong pro-management terms also cannot alone support a finding of failure to bargain. *Chevron Oil Co. v. NLRB*, 442 F.2d 1067, 1073 (5th Cir. 1971). The mere rejection by the employer of terms which were in a previous contract, even a clause as important to the union as a union security provision, is also not sufficient evidence of bad faith. *NLRB v. Getlan Iron Works, Inc.*, 377 F.2d 894 (2d Cir. 1967).[4]

Even though these particular actions are insufficient alone to support a finding of refusal to bargain, the courts have emphasized that such conduct may be considered by the Board along with other evidence and that the totality of the circumstances may justify a finding of failure to bargain in good faith. *Queen Mary Restaurants Corp. v. NLRB*, 560 F.2d 403 (9th Cir. 1977); *Continental Insurance Company v. NLRB*, 495 F.2d 44, 48 (2d Cir. 1974). This circuit has specifically held that the Board can look at the content of the bargaining proposals as part of its review of all the circumstances. *NLRB v. Holmes Tuttle Broadway Ford, Inc.*, 465 F.2d 717, 719 (9th Cir. 1972). In addition, however, the Board must show "substantial evidence that the company's

---

**3.** The District of Columbia Circuit has held that the NLRB should always apply the adverse inference rule in cases before it. This rule provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him. *International Union (UAW) v. NLRB*, 148 U.S.App. D.C. 305, 459 F.2d 1329 (1972). We do not decide here either whether this rule should be

generally applied to NLRB cases or whether it is appropriate to the factual situation presented in this case.

**4.** We reject the suggestion in the Board's opinion that "a significant compensatory proposal" is required when a decidedly less favorable offer is made. Such a flat rule would place the Board in the position of dictating substantive terms to the parties.

attitude was inconsistent with its duty to seek an agreement" before a finding of failure to bargain is warranted. *NLRB v. MacMillan Ring-Free Oil Co.*, 394 F.2d 26, 29 (9th Cir.), *cert. denied*, 393 U.S. 914, 89 S.Ct. 237, 21 L.Ed.2d 199 (1968).

 Therefore, in our review of the evidence in this case, we can consider the regressive nature of the .wage proposals made by the company and the dropping of existing terms favorable to the union. However, there must be additional evidence before we can accept the Board's inference that the company failed to bargain in good faith.

D. *Principles Applied to the Facts in This Case.*

Applying these principles to the facts of this case is not easy. Looking at the record as a whole, however, we believe the finding of refusal to bargain is warranted here. The company's violation of the settlement agreement covering the first unfair labor practice charge indicates an unwillingness to deal with the union. The continuing pattern of communications directly with employees is also indicative of a desire to bypass the union. Timing is also a crucial factor here. Immediately after the union went on strike the wage offers were lowered. The company also first proposed to drop the union security clause and other terms favorable to the union after the strike started. Such action is suspect since negotiations had been going on for over six months and these issues had not been brought up before. The refusal to provide supporting data is consistent with a desire on the part of the company to frustrate negotiations. Viewed separately, each of these actions indicates only hard bargaining by the company. However, viewing these actions cumulatively, as we must, we find that there is substantial evidence to support the Board's conclusion that after the union went out on strike, the company's main goal

was to punish, not to bargain with, the union.

If the Board's finding that the company failed to bargain in good faith is sustained, its other conclusions must also be upheld. Since the company did not bargain in good faith, there could be no impasse. *United Fire Proof Warehouse Co. v. NLRB*, 356 F.2d 494, 498 (7th Cir. 1966). Thus, the company's unilateral implementation of its last wage proposal was an independent violation of the duty to bargain. *NLRB v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Similarly, the strike was converted to an unfair labor practice strike on the date the unfair practice was committed. *NLRB v. Tom Joyce Floors, Inc.*, 353 F.2d 768, 772 (9th Cir. 1965).

Therefore the order of the Board shall be enforced in full.[5]

---

5. The company makes a final claim that the Notice required by the Board's order is inaccurate. It states that the company will reimburse all employees for any loss of wage occasioned by its "unilateral action in disregarding the wages, terms and working provisions of that certain agreement existing between the Company and the Union which expired on May 1, 1974." We think this is clear in requiring reimbursement only for violations of the old contract and that no reimbursement is required for any conduct after May 1.