HALEY & HALEY, INC.; Oceanway
Transport, Inc.,
Petitioners–Cross–Respondents,

v.

NATIONAL LABOR RELATIONS
BOARD,
Respondents–Cross–Petitioners.

Nos. 88–7303, 88–7361.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 3, 1989.

Decided July 28, 1989.

Duane Vergeer, Vergeer, Roehr & Sweek, Portland, Or., for petitioners-cross-respondents.

Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Robert F. Mace, Atty., N.L.R.B., for respondents-cross-petitioners.

Before TANG, BOOCHEVER and KOZINSKI, Circuit Judges.

PER CURIAM:

Haley and Haley, Inc., and Oceanway Transport, Inc., petition for review of the National Labor Relations Board's (NLRB) decision finding them in violation of sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (a)(5) (1982), and ordering petitioners to comply with the terms of the collective bargaining agreement between Haley & Haley and Local 3–140 of the International Woodworkers of America (the Union). The NLRB found that Oceanway was an alter ego of Haley & Haley, and therefore bound by the collective bargaining agreement between Haley & Haley and the Union. The NLRB further found that petitioners violated sections 8(a)(1) and 8(a)(5) by transferring employees and equipment from Haley & Haley to Oceanway to avoid their obligations under the collective bargaining agreement. The Board ordered petitioners to cease the transfer, to honor the collectively bargained terms and conditions of the agreement between the Union and Haley & Haley, and to make whole the bar-

gaining unit employees for any losses suffered as a result of petitioners' breach of the collective bargaining agreement. The Board's finding that petitioners violated sections 8(a)(1) and 8(a)(5) will be upheld if supported by substantial evidence. *NLRB v. Pacific Grinding Wheel Co.*, 572 F.2d 1343, 1347 (9th Cir.1978).

### Facts

The essential facts are undisputed. Haley & Haley is a closely held, family run corporation engaged exclusively in the business of hauling logs. Its employees are represented by Local 3–140 of the International Woodworkers of America, AFL–CIO. Oceanway is a wholly owned subsidiary of Haley & Haley. It hauls logs as well as general commodities, including heavy equipment. Log-hauling accounts for the majority of Oceanway's business.

In 1985, Champion Paper Co. and International Paper Co., Haley & Haley's chief clients, announced significant reductions in their logging operations. On April 12 of that year, Champion shut down its operations. In addition to curtailing its operations, International announced its intention to contract for log-hauling services only at rates considerably below those charged by Haley & Haley. Champion's termination and International's business curtailment and rate reduction had an immediate and drastic effect upon Haley & Haley. The problem was compounded by Haley & Haley's inability to compete effectively against other non-union log-hauling companies that were not obliged under collective bargaining agreements to pay union scale wages and benefits to their drivers.

On March 30, 1984, partly in response to the declining fortunes of the logging industry, but before the two events described above, Haley & Haley purchased Oceanway in order to acquire its general commodities hauling permit. Shortly thereafter, Oceanway acquired a log-hauling permit. Because Oceanway was not a signatory to a collective bargaining agreement, Larry Haley, Haley & Haley's vice-president, believed it could effectively compete with other non-union trucking companies. For this reason, Larry Haley decided to sell Haley & Haley logging trucks to Oceanway. The first five trucks were sold to Oceanway on February 17, 1985.

Although the evidence suggests that Haley & Haley did not inform the Union of this sale, shortly thereafter Haley & Haley and the Union began to discuss the possibility of the Union granting Haley & Haley mid-contract wage and benefit concessions. During the pendency of these negotiations, Haley & Haley continued to sell its logging trucks to Oceanway. By May 7, 1985, all but four had been sold to Oceanway. On August 8, 1985, after unsuccessfully attempting to negotiate wage and benefit concessions from the Union, Haley & Haley sold its remaining trucks to Oceanway.

The Union filed an amended complaint against Oceanway and Haley & Haley on July 31, 1985, alleging violations of sections 8(a)(1) and 8(a)(5) of the NLRA. The case was first heard before an administrative law judge, who concluded that Oceanway was not a disguised corporation and therefore was not created for the purpose of evading Haley & Haley's obligations under the collective bargaining agreement. The ALJ based this conclusion upon a finding that the two entities did not compete in the same market: Haley & Haley, unlike Oceanway, was contractually bound to pay higher wages and benefits, and therefore could not afford to obtain work at the prevailing trucking rates offered by International or the smaller, independent logging companies. After finding that Oceanway was not an alter ego of Haley & Haley, the ALJ, applying the principles set forth in *Milwaukee Spring Division of Illinois Coil Spring Co.*, 268 N.L.R.B. 601 (1984), *aff'd, sub nom. International Union, United Automobile, Aerospace and Agricultural Implement Workers of Am.*, 765 F.2d 175 (D.C.Cir.1985),[1] concluded that Haley & Haley had discharged its contractual responsibilities to the Union by bargaining to a good-faith impasse before transferring its assets and employees to Oceanway.

The NLRB reversed the ALJ's decision. The Board found that Oceanway was an alter ego of Haley & Haley, and that the transfer was little more than an attempt by

---

1. *Milwaukee Spring* considered whether, under

sections 8(a)(5) and 8(d), an employer was

Haley & Haley to avoid its contractual obligations. The Board also found that the *Milwaukee Spring* analysis was inappropriate, since Haley & Haley's sham transfer of assets to Oceanway did not relieve it of its obligation to honor the wage and benefit conditions contained in the collective bargaining agreement. The Board also found that, even if *Milwaukee Spring* was applicable, Haley & Haley had failed to bargain in good faith prior to the transfer of its assets.

### Discussion

Petitioners contend that Oceanway is not an alter ego of Haley & Haley, and that the Board mischaracterized the nature of the transfer of equipment and employees from Haley & Haley to Oceanway. Petitioners argue that the transfer was an economically motivated business decision akin to a plant relocation or closing, and that the proper inquiry by the Board should have been (a) whether the transfer by Haley & Haley amounted to a modification of the terms or conditions of the collective bargaining agreement, and (b) whether the employer first attempted to bargain in good faith with the Union before unilaterally executing the change in its business. Contrary to the Board's finding, Haley & Haley contends that it bargained in good faith with the Union, and that only after reaching an impasse in bargaining over wages and benefits did it decide to transfer operations from Haley & Haley to Oceanway.

Although the transfer of assets and equipment to an alter ego corporation may bear some facial resemblance to the type of transfer considered in *Milwaukee Spring* or *Otis Elevator Co.*, 269 N.L.R.B. 891 (1984), the alter ego transfer is in essence a sham transaction, motivated by the employer's desire to avoid its contractual obligations. *See, e.g., Howard Johnson Co. v. Hotel & Restaurant Employees Local Joint Executive Bd., Hotel & Restaurant*

*Employees & Bartenders Int'l Union, AFL–CIO*, 417 U.S. 249, 259 n. 5, 94 S.Ct. 2236, 2242 n. 5, 41 L.Ed.2d 46 (1974) ("Such cases involve a mere technical change in the structure or identity of the employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management."); *Advance Electric, Inc.*, 268 N.L.R.B. 1001, 1002 (1984).

Our inquiry therefore must begin with the Board's determination that Oceanway is an alter ego rather than a bona fide successor of Haley & Haley. The alter ego analysis is crucial in determining whether Oceanway is obliged to comply with the collective bargaining agreement between the Union and Haley & Haley, since a successor company, unlike an alter ego, is generally not bound by the collective bargaining agreement of its predecessor. *See, e.g., Dariano & Sons, Inc. v. District Council of Painters No. 33*, 869 F.2d 514, 518 (9th Cir.1989). If, on the other hand, the entity is an alter ego, then it is obliged to honor its "predecessor's" contractual obligations. *Howard Johnson Co.*, 417 U.S. at 259 n. 5, 94 S.Ct. at 2242 n. 5. Moreover, such a finding renders unnecessary any inquiry under *Milwaukee Spring*, since a determination of alter ego status necessarily means that the transfer was little more than a sham intended to disguise corporate control. To put it differently, "[i]n *Otis Elevator* [and *Milwaukee Spring*], the issue is whether there is a duty to bargain over the decision to transfer work out of a unit; in alter ego cases, the issue is whether the work is effectively still in the unit because the allegedly new employer is the same as the former employer." Decision and Order, *Haley & Haley, Inc. and Oceanway Transport, Inc.*, 1987–88 NLRB Dec. (CCH) ¶ 19,941, at 33,-770, 33,774.

▮▮▮▮ "The focus of the alter ego test ... is on the existence of a disguised con-

---

obliged to obtain the consent of the Union before transferring its operations from a union to a nonunion plant. The NLRB held that unless such closure or transfer was specifically covered by the collective bargaining agreement, the employer was free to unilaterally effect such changes, so long as the employer first bargained

to a good-faith impasse with the union about the relocation decision. *Milwaukee Spring*, 268 NLRB at 603. Although not stated, the ALJ apparently believed that the transfer of assets and employees from Haley & Haley to Oceanway was analogous to the relocation of the union plant's operations in *Milwaukee Spring*.

tinuance of the same business or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or a technical change in operations." *Dariano* 869 F.2d at 518; *accord Gateway Structures, Inc. v. Carpenters 46 N. Cal. Counties Conf. Bd.*, 779 F.2d 485, 488 (9th Cir.1985); *J.M. Tanaka Constr., Inc. v. NLRB*, 675 F.2d 1029, 1035 (9th Cir.1982). Four factors must be considered in determining whether one business entity is an alter ego of the other: "(1) centralized control of labor relations, (2) common management, (3) interrelation of operations, and (4) common ownership and financial control." *J.M. Tanaka Constr.*, 675 F.2d at 1033; *see also Advance Electric, Inc.*, 268 N.L.R.B. at 1002 (relevant factors to be considered by the Board in assessing alter ego status of successor company include " ' "substantially identical" management, business purpose, operation, equipment, customers, and supervision, as well as ownership' " of the two entities) (quoting *Denzil S. Alkire*, 259 N.L.R.B. 1323, 1324 (1982), *enforcement denied*, 716 F.2d 1014 (4th Cir.1983)). In addition, the determination that one entity is merely another's alter ego will depend to some extent on whether or not the transfer of assets or the dissolution of the old entity is motivated by union animus. *See J.M. Tanaka Constr.*, 675 F.2d at 1035 (substantial evidence supported finding that alter ego was created for purpose of eliminating high cost of dealing with union); *see also Milwaukee Spring*, 268 N.L.R.B. at 601 (economic relocation "economically motivated and was not the result of union animus").

■ Although we have held that "[t]he most important single factor [in the alter ego analysis] is centralized control of labor relations," *J.M. Tanaka Constr.*, 675 F.2d at 1034, a threshold determination must be made in every alter ego case: whether both companies are substantially owned and controlled by identical parties. *See, e.g.,*

*Crawford Door Sales Co.*, 226 N.L.R.B. 1144, 1144 (1976).

■ The undisputed evidence demonstrates that Haley & Haley and Oceanway are owned and controlled by the same parties. Indeed, petitioners concede that the Haley family owned both companies.[2] They contend, however, that the management of the two entities is separate. Substantial evidence supports the Board's finding that the management of Haley and Oceanway was identical. For example, Larry Haley was Haley & Haley's vice-president and is Oceanway's secretary-treasurer; Loren Haley is Haley & Haley's president and is Oceanway's president; Charles Ritchey was Haley & Haley's treasurer and accountant as well as Oceanway's accountant.

Although petitioners concede that both Loren and Larry Haley "provide input and advice in the management of Oceanway," Petitioners' Opening Brief at 14, and that, by virtue of Haley & Haley's ownership of Oceanway, "[t]hey are ... entitled to a policy voice in the operation of Oceanway," *id.*, they contend that neither Larry nor Loren Haley is directly involved in the management of Oceanway. The evidence, however, shows that Larry Haley played a dominant role in all aspects of the management of both companies, as well as in Haley & Haley's decision to purchase Oceanway, to terminate Haley & Haley's business and to sell Oceanway its trucks, and to activate Oceanway's log-hauling license. Moreover, the Board accorded little weight to Larry Haley's testimony that he was largely uninvolved in Oceanway's daily operations. Instead, the Board found that

> [t]he evidence discloses that Larry spends a significant amount of time engaging in dispatching duties for Oceanway. Further Lee [Haley] and Paul [Haley, Sons of Larry Haley], who purportedly are two of Oceanway's managers, did not even begin working for Oceanway until it began hauling logs on Febru-

**2.** Moreover, ownership of Haley & Haley is concentrated in the hands of the president and vice-president of Haley & Haley, Larry and Loren Haley. The Board found that "Loren and Larry [Haley] together own 467 of the approxi- mately 480 outstanding shares of Haley & Haley, and 12 of the remaining 13 outstanding shares are owned by members of the Haley family." ER 18.

ary 17; before that they had driven trucks for Haley & Haley.

Decision and Order, *Haley & Haley, Inc,* 1987–88 NLRB Dec. (CCH) ¶ 19,491, at 33,-775. Although the evidence did not conclusively demonstrate that the same individuals played a significant role in the day-to-day operations of both companies,[3] there was substantial evidence to indicate that Larry Haley was a dominant figure in major as well as minor management decisions for both companies.

Substantial evidence also supports a finding that there existed centralized control over labor relations for both Haley & Haley and Oceanway. For example, Larry Haley, Oceanway's president, and Loren Haley, Oceanway's secretary-treasurer, played significant roles in Haley & Haley's attempt to renegotiate its contract with the Union. The Board also found, based in part on Larry Haley's testimony, that the sale of Haley & Haley's assets to Oceanway was intended to reduce labor costs by hiring only nonunion labor. The Board heard testimony from Larry Haley that, before any of Haley & Haley's drivers would be hired by Oceanway, they were required to withdraw from the Union. Eventually eleven of Haley & Haley's drivers were employed by Oceanway.

The evidence also supports the Board's finding that there existed a close interrelation of operations between the two companies. Evidence relevant to a finding of close interrelationship of operations includes, but is not restricted to, shared use of office space, supplies and equipment, similar client base and operations, as well as any joint undertakings or financial relationships. *See J.M. Tanaka Constr.,* 675 F.2d at 1034. It is clear that the equipment, business purpose, operations and customers of both Haley & Haley and Oceanway are substantially identical. First, there was evidence that Haley &

Haley and Oceanway had close financial ties, which included the sale of Haley & Haley's major assets to Oceanway under a variable payment system. Between February 17, 1985, and August 8, 1985, Haley & Haley sold all of its 21 log-hauling trucks to Oceanway. The means of executing and financing the sale of the trucks plainly suggested the close relationship between the two companies. In fact, according to petitioners' accountant, Charles Ritchey, Oceanway and Haley & Haley maintained an "intercompany account" to pay off debts to one another. As already noted, Larry Haley, the vice-president of Haley & Haley and the president of Oceanway, was instrumental in the sale of Haley & Haley's trucks to Oceanway. Ritchey also testified that Oceanway assumed some of Haley & Haley's obligations when the latter was no longer able to make some payments on its own notes to the bank. He stated that this procedure constituted automatic payment from Oceanway to Haley & Haley.

Second, the evidence indicated that both entities operated out of the same office. Third, both entities engaged in the same type of trucking, and conducted business with many of the same clients. Although Oceanway hauls both logs and general commodities, log hauling is the predominant portion of Oceanway's business. *See Advance Electric,* 268 N.L.R.B. at 1002 (substantially identical business purpose found where predecessor did residential and commercial contracting and successor did only residential contracting where less than 10 percent of predecessor's business was commercial). As was already noted, both entities employed many of the same drivers, though Oceanway refused to hire any Haley & Haley trucker until he withdrew from the Union.

Finally, there is substantial undisputed evidence that Oceanway was activated for the purpose of eliminating the high costs of

---

**3.** While the Board found that Larry Haley exercised daily control over the business affairs of Haley & Haley, the evidence did not clearly demonstrate who exercised managerial and supervisory authority over the day-to-day operations of Oceanway. Despite petitioners' assertion that Lee and Paul Haley, as well as Charles Carlow, managed Oceanway, the evidence indicated that both Lee and Paul spent most of their time on the road as Oceanway truck drivers.

dealing with the Union. *See J.M. Tanaka Constr.*, 675 F.2d at 1035. Larry Haley stated on several occasions that the chief purpose for transferring Haley & Haley's assets to Oceanway was to avoid the high costs of union labor. *See Advance Electric*, 268 N.L.R.B. at 1004 (finding of alter ego status supported by evidence that predecessor activated alleged alter ego for the purpose of avoiding union labor costs under predecessor's collective bargaining agreement). While petitioners do not dispute the finding that Oceanway was activated in part to compete effectively against other non-union trucking firms, they nonetheless argue that Oceanway cannot be the alter ego of Haley & Haley, because the two companies competed in different markets: Haley & Haley for union-scale trucking contracts, Oceanway for non-union contracts. Oceanway's ability to successfully compete for non-union contracts does nothing to negate the conclusion that it is an alter ego of Haley & Haley: Achievement of the proscribed purpose of an alter ego transfer cannot be used to support a finding that the two companies are distinct.

We therefore conclude that substantial evidence supports the Board's determination that Oceanway is the alter ego of Haley & Haley.[4] Haley & Haley's transfer of assets to Oceanway relieved neither entity of its obligation to honor an express term in the contract. Nor was Haley & Haley excused from honoring the contract merely because it allegedly attempted to negotiate contract concessions with the Union before transferring its assets and employees to Oceanway.[5] "While a contract is in force, section 8(d) permits the union to refuse, even unreasonably, an employer's proposal to modify the terms established by the collective bargaining agreement." *Standard Fittings Co. v. NLRB*, 845 F.2d 1311, 1315 (5th Cir.1988); *see also Milwaukee Spring*, 268 N.L.R.B. at 602 (under section 8(d), an employer must obtain the consent of the union before modifying a term or condition of the contract).

We enforce the Board's order in its entirety.

---

**4.** In finding that the Board's ruling was supported by substantial evidence, we reject petitioners' contention that the Board improperly ignored the ALJ's credibility determinations. In reviewing conclusions by the ALJ, the Board is "free to draw its own inferences from all of the evidence presented, giving whatever weight it [feels] appropriate to the company's self-serving explanations." *NLRB v. Pacific Grinding Wheel Co.*, 572 F.2d 1343, 1347 (9th Cir.1978). Where, as here, the Board can point to evidence in support of its inferences, we will "allow[ ] the Board's finding to stand despite the fact that the Administrative Law Judge interpreted the facts contrary to the inferences drawn" by the Board." *Id.*

**5.** In any event, the Board found that Haley & Haley failed to engage in timely bargaining over wage concessions prior to transferring its equipment and employees to Oceanway. Given the fact that Haley & Haley had already sold five of its trucks to Oceanway before attempting to extract concessions from the Union, we think this finding is supported by substantial evidence.