**U.A. LOCAL NO. 343 OF the UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPEFITTING INDUSTRY OF the UNITED STATES AND CANADA, AFL–CIO, U.A. Local Nos. 159, 342,**

---

342 and 444 Combined Pension Trust Fund, U.A. Local Nos. 59, 342, 343 and 444 Combined Health & Welfare Trust Fund, and U.A. Local No. 343 Journey Man and Apprentice Training Trust Fund, Plaintiff,

v.

NOR–CAL PLUMBING, INC., North Bay Plumbing, Inc., Elmar Lee Pettit, a.k.a. Elmer Lee Pettit, and Audrey Jean Pettit, Defendants.

No. C 87–2365 BAC.

United States District Court, N.D. California.

April 22, 1992.

John J. Davis, Jr., McCarthy, Johnson & Miller, San Francisco, Cal., for plaintiff.

Mark R. Thierman, Thierman, Cook, Brown & Prager and Henry F. Telfeian, Keck, Mahin & Cate, San Francisco, Cal., for defendants.

## ORDER GRANTING SUMMARY JUDGMENT

CAULFIELD, District Judge.

This matter comes before the court on defendants' motion for partial summary judgment and plaintiffs' cross-motion for partial summary judgment. Oral argument was heard on January 17, 1992. After careful consideration of the parties' written and oral arguments, documents submitted in support, and the record as a whole, the court finds it appropriate to DENY defendants' motion and GRANT plaintiffs' motion.

BACKGROUND

Plaintiffs are U.A. Local No. 343, a plumbers and pipefitters union, and the labor-management trust funds in which it participates. Defendant Nor–Cal Plumbing, Inc. ("Nor–Cal"), has been a party signatory to successive collective bargaining agreements with plaintiff U.A. Local 343 since at least 1965.[1] The complaint alleges that defendants transferred the business of Nor–Cal, owned by defendant Elmar Lee Pettit, to defendant North Bay Plumbing, Inc. ("North Bay"), which was established in 1980. North Bay is a non-union company allegedly owned by Mr. Pettit's wife, defendant Audrey Jean Pettit, but which plaintiffs contend was in fact owned, controlled and managed by Mr. Pettit. It is alleged that North Bay continued Nor–Cal's business, but has not honored U.A. Local 343's Labor Agreement (the "Agreement").

In Count II, plaintiff trust funds seek an audit in order to recover the pension, health and welfare and other fringe benefit contributions they should have received had defendants applied the Agreement to North Bay. Plaintiffs have obtained the audit through discovery, and seek judgment in the amount of $2,551,244.28 delineated as follows: 1) fringe benefit contributions—$1,066,820.07; 2) liquidated damages—106,682.09; 3) interest—$899,066.00; 4) attorneys fees and litigation—$478,736.12. Their claims are made under Section 301 of the LMRA for breach of the Agreement and under Sections 502 and 515

---

1. On or about June 30, 1983, Nor–Cal executed a two-year Memorandum of Understanding modifying the then-existing Master Labor Agreement by and between the Plumbing, Heating and Cooling Contractors Association of Napa, Sola-no and Lake Counties and plaintiff U.A. Local 343. On or about May 7, 1984 defendant Nor–Cal executed the Residential Plumbing Addendum to the Master Labor Agreement, extending the agreement to at least June 30, 1987.

of ERISA for failure to make the required contributions.

In Count III, plaintiffs claim that defendants fraudulently concealed the true nature and extent of their business through affirmative acts of deception as well as failures to disclose material information.

Count IV is a claim by plaintiff trust funds for punitive damages in an amount equal to compensatory damages based upon the alleged willful and malicious behavior of defendants. Plaintiffs seek an order granting summary judgment against all four defendants on Counts II, III and IV of the Complaint.[2]

## STATUTE OF LIMITATIONS AND/OR LACHES

■ Defendants again attempt to raise a state of limitations or laches defense in this action. However, plaintiff's claims have already been held not to be time-barred. As Judge Schwarzer stated in his order dated May 24, 1988,

> This undisputed record of fraud, deception and obstruction suffices to estop these defendants from asserting the statute of limitations after January, 1981.

New facts have not been brought to light, but rather defendants seek to reargue points previously raised and rejected. The court will not entertain such arguments.

## SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where the movant shows that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law. In making this determination, the Court must draw inferences in the light most favorable to the non-moving party, and the burden is on the movant to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has met this burden, the non-moving party may not rest on

the allegations in the pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Thus, the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## NOR–CAL AND NORTH BAY ALTER EGO TEST

■ This case arises out of the alleged double-breasting of defendants. A double-breasted employer relationship is where a union-signatory business or its owners also have an interest in another similar non-union business. Although double-breasting is not *per se* unlawful, if the non-union business is found to be the "alter ego" of the union business, they will be held to have violated the labor agreement.

■ Plaintiffs allege that North Bay is the alter ego of Nor–Cal. Plaintiffs must first establish that the businesses are a single employer. After such an initial single-employer finding, the court determines whether the non-union business is in reality either the disguised continuance of a former union signatory or an attempt to avoid the obligations of the union signatory's collective bargaining agreement through a sham transaction or a technical change in operation. *Haley & Haley, Inc. v. NLRB*, 880 F.2d 1147, 1149–50 (9th Cir.1989); *Northwest Admrs., Inc. v. Con Iverson Trucking, Inc.*, 749 F.2d 1338, 1340 (9th Cir.1984).

■ If the two businesses are found to be only a single employer, the N.L.R.B. must determine whether their employees together constitute an appropriate bargaining unit, and thus whether the double-breasted employer can be held liable under the labor agreement. *International Woodworkers of America v. Ketchikan Pulp Co.*, 611 F.2d 1295 (9th Cir.1980). If the alter ego relationship is established,

---

2. The Union's claims in Count I for wages and dues were dismissed without prejudice for pur- suit under the Agreement's grievance procedure.

however, the Court may proceed directly to enforcement of the collective bargaining agreement. *A. Dariano & Sons, Inc. v. District Council of Painters No. 33*, 869 F.2d 514, 518 (9th Cir.1989). Damages recoverable by trust funds in alter ego cases under ERISA consist of unpaid fringe benefit contributions plus liquidated damages, interest and attorneys' fees. 29 U.S.C. §§ 1132(g)(2), 1145.

■ The criteria for determining single employer status are 1) interrelation of operations, 2) common management, 3) centralized control of labor relations, and 4) common ownership. *NLRB v. Don Burgess Constr. Corp.*, 596 F.2d 378, 384 (9th Cir.1979), *cert. denied*, 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979). No one factor is controlling nor need all criteria be present. *Id.* "Single employer status ultimately depends on 'all the circumstances of the case' and is characterized as an absence of an 'arm's length relationship found among unintegrated companies.'" *Id.* at 384 (citations omitted).

The most important factor is centralized control of labor relations. *J.M. Tanaka Constr., Inc. v. NLRB*, 675 F.2d 1029, 1034 (9th Cir.1982) (citing *Los Angeles Marine Hardware Co. v. NLRB*, 602 F.2d 1302, 1305 (9th Cir.1979)). Commonly controlled labor relations can be shown either on the basis of common control of day-to-day labor matters, *Tanaka*, 675 F.2d at 1034, or by showing that the person in charge of the union company's labor relations made the decision that the second company would be non-union. *Burgess*, 596 F.2d at 385–86. It is undisputed that Mr. Pettit controlled Nor–Cal's labor relations. As for North Bay, sworn declarations and deposition testimony establish that Mr. Pettit handled the hiring, firing, promotions, demotions, training and supervising and thus controlled day-to-day labor matters. Moreover, extensive evidence establishes that Mr. Pettit concealed having established North Bay and made the decision that North Bay would be non-union.

Evidence of common control of labor relations also shows common management. In addition, the minutes of North Bay's original corporate directors' meeting show Mr. Pettit as North Bay's sole director, president and chairman.[3] Mr. Pettit was also the contractor's license qualifier and responsible managing officer for both Nor–Cal and North Bay. Under California law the qualifier is "responsible for exercising such direct supervision and control of [the contractor's] operations as is necessary to secure full compliance with the provisions of this chapter...." Cal.Bus. & Prof.Code § 7068.1. The Ninth Circuit has found this to be a significant factor. *Burgess*, 596 F.2d at 385.

The evidence also indicates that Mr. Pettit had financial control of North Bay, and in fact from mid–1983 through 1986, signed over half of North Bay's checks. Finally, according to their sworn declarations, customers dealt with Mr. Pettit when they wanted bids or had problems.

Uncontroverted evidence shows that Nor–Cal and North Bay had closely interrelated operations. They shared equipment, material and supplies, coordinated and combined purchases, and made a number of "loans" without interest or promissory notes. Thus, Nor–Cal and North Bay were not operated at "arm's length," but rather should be treated as a single employer.

Having established the threshold issue of single employer status, the court now addresses the alter ego issue. As explained by the Ninth Circuit in *Haley*, "the alter ego transfer is in essence a sham transaction, motivated by the employer's desire to avoid its contractual obligations." 880 F.2d at 1149 (citations omitted). There is substantial undisputed evidence that North Bay was set up in order to eliminate the high costs of dealing with the Union. Jack Couthit, North Bay's purchasing agent, has so testified. In addition, John Adams, the initial manager at North Bay, admitted that the purpose "was to transfer Nor–Cal's customers to North bay, close down

**3.** Another version of the same minutes shows Mrs. Pettit as the sole director, president, and chairman of North Bay.

Nor–Cal Plumbing, and then have a non-union shop."

Defendants transferred Nor–Cal's major customers to North Bay, including the two largest, Lewis Homes and Presley Homes. Frank Hodel, who was supposedly in charge of North Bay, has testified that he was surprised by the transfer of the Presley Homes account, which took place when Mr. Pettit was on a fishing trip in Mexico with Garth Patterson, Presley's vice president. Kaufman and Broad's Bradbury Homes project was taken over by North Bay in the middle of the job, as testified by Cliff Russell. The person Mr. Russell dealt with for both Nor–Cal and North Bay was Mr. Pettit.

Defendants' assertion that Nor–Cal was unable to bid competitively is not supported by the evidence. Nor–Cal had been successful in obtaining bids, but Mr. Pettit and Nor–Cal Superintendent Dave Adams stopped bidding new work in December 1986. Dave Adams transferred to North Bay in January 1987.

The issue of whether an alter ego relationship exists is particularly fact-intensive, and frequently summary judgment is inappropriate. *See Sheet Metal Workers International Assoc. v. Arizona Mechanical & Stainless, Inc.* 863 F.2d 647, 652 n. 5 (9th Cir.1988). In this instance, however, plaintiffs' evidence, including defendants' admissions, documentary evidence, and the testimony of disinterested percipient witnesses, is overwhelming. Defendant's are unable to contradict plaintiffs' evidence by reliable documentary or disinterested third-party evidence.

The only evidence supporting defendants' position are the denials by Mr. Pettit of ownership and management of North Bay. These statements are contradicted by numerous previous statements by Mr. Pettit that he did own and manage it, including those contained in North Bay's contractors' license applications made under penalty of perjury. The Ninth Circuit has stated,

> The very object of summary judgment is to separate real and genuine issues from those that are formal or pretended, so that only the former may subject the

moving party to the burden of trial. Here we are convinced that the issues of fact created by [the non-moving party] are not issues which this Court could reasonably characterize as genuine; rather, they are sham issues which should not subject the defendants to the burden of a trial.

*Radobenko v. Automated Equipment Corp.,* 520 F.2d 540, 543–44 (9th Cir.1975). Defendants' denials do not establish a genuine issue of material fact. Accordingly, summary judgment is GRANTED in favor of plaintiffs.

## PERSONAL LIABILITY OF THE PETTITS

◼ Ninth Circuit decisions have considered three factors in determining whether to pierce the corporate veil: 1) a unity of interest and ownership between the corporation and the shareholder such that the two no longer exist as separate entities; 2) failure to disregard the corporation would result in injustice; and 3) fraudulent intent of the incorporators to evade civil or criminal liability. *Seymour v. Hull & Moreland Engineering,* 605 F.2d 1105, 1111 (9th Cir.1979). Although plaintiff need only establish injustice *or* fraudulent intent in addition to disregard of the corporate identity, *Board of Trustees v. Valley Cabinet & Mfg. Co.,* 877 F.2d 769, 773 (9th Cir.1989), all three factors are present here.

The evidence demonstrates that the Pettits did not respect the separate corporate identities of either Nor–Cal or North Bay. The Pettits regularly paid for personal expenses out of corporate funds, including grocery and hardware store bills, improvements on personally owned real estate, vehicles and repairs, life insurance, home utility bills, real estate tax and insurance on their property, and fees for preparing their wills. The Ninth Circuit has held that such commingling of assets is "among the more serious abuses of the corporate identity." *Valley Cabinet,* 877 F.2d at 773. In addition, defendants' records contain references to large loans to and from the Pettits. These loans demonstrate a disregard of the corporate identity, because no promissory notes were ever executed and there is no

evidence that interest was paid. *Laborers Clean-up Contract Admin. Trust Fund v. Uriarte Clean-up Service, Inc.*, 736 F.2d 516, 524 (9th Cir.1984).

■ As for fraudulent intent, as Judge Schwarzer stated in his order of May 24, 1988, defendants' conduct with respect to North Bay presents "an undisputed record of fraud, deception and obstruction." The evidence establishes that North Bay was formed for the purpose of defrauding the union and the trust funds. Frank Hodel and Robert Dandor have testified that concealment of the two companies' relationship occurred on a daily basis. For example, Mr. Pettit frequently told North Bay plumbers that "you didn't see me here," and stated to Lewis Homes Superintendent Donald Burton that he had to "be careful to conceal his involvement with North Bay so that he would not get caught at double-breasting." Defendants' fraudulently failed to report the work hours of their non-union plumbers. Post-incorporation use of the corporate form to perpetrate fraud satisfies the fraudulent intent element, especially where employee protection is at issue. *Valley Cabinet*, 877 F.2d at 773–74.

Moreover, it would be unjust to recognize the corporate entities, which would allow the Pettits to retain the financial rewards of their fraudulent scheme and would prevent plaintiffs' recovery.[4] The doctrine of piercing the corporate veil "is designed to prevent a person from doing injury and then escaping responsibility by hiding behind a corporate shield." *Plumbers & Fitters v. Matt J. Zaich Constr. Co.*, 418 F.2d 1054, 58 (9th Cir.1969).

Since the Pettits are personally liable under the corporate veil-piercing doctrine, the court does not reach the issue of whether the Pettits should be held personally liable as participating tortfeasors or

under section 301 of the LMRA, 29 U.S.C. § 185.

## PUNITIVE DAMAGES

■ The Ninth Circuit has held that an award of punitive damages under Section 502(g)(2)(E) of ERISA is warranted where the employers' refusal to make promised contributions was "willful, wanton and malicious." *Winterrowd v. David Freedman & Co.*, 724 F.2d 823, 826 (9th Cir.1984) (citations omitted); *see also Cox v. Eichler*, 765 F.Supp. 601 (N.D.Cal.1990); *Kuntz v. Reese*, 760 F.2d 926 (9th Cir.1985), *withdrawn and vacated on other grounds*, 785 F.2d 1410 (1986). "Once the factual predicate for aggravated conduct is established, the imposition of punitive damages is discretionary with the trier of fact." *Winterrowd*, 724 F.2d at 826. Plaintiffs have established that defendants' refusal to make contributions were not only wilful, wanton and malicious, but also fraudulent. The court finds that a punitive damages award in the $2,000,000.00, approximately equal to plaintiffs' compensatory damages, is appropriate.

## ATTORNEYS' FEE AND COSTS

As prevailing parties, the plaintiffs are entitled to a mandatory award of attorneys' fees to the plaintiff trust funds under section 502(g)(2)(D) of ERISA. 29 U.S.C. § 1132(g)(2)(D).[5]

## CONCLUSION

For the forgoing reasons, summary judgment its hereby granted in favor of plaintiff Trust Funds and against all defendants as to Counts II, III and IV. Defendants' motion for partial summary judgment is denied in its entirety. Defendants are directed to pay damages to plaintiff Trust Funds in the amount of $2,551,244.28 for fringe benefit contributions, liquidated damages, interest, and attorneys' fees and

---

4. According to the analysis of Michael Keiser, as of 1988, the combined assets of Nor–Cal and North Bay were approximately $127,000, whereas plaintiffs' claims total over $2,000,000.

5. Section 502(g)(2)(D) provides:

(1) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan

(D) reasonable attorney's fees and costs of the action, to be paid by the defendants.

litigation expenses, plus an additional $2,000,000 in punitive damages.

IT IS SO ORDERED.